# EXHIBIT 1

# EXHIBIT 1

# In The Matter Of:

22-14616-nmc

IN RE. LEHNER AND LEHNER

---

**Transcription Of:**

*SECTION 341*

*MEETING*

*February 24, 2023*

---



**702-805-4800**
scheduling@envision.legal

Nevada Firm No. 088F

<pre>
 1              UNITED STATES BANKRUPTCY COURT

 2                   DISTRICT OF NEVADA

 3      _____

 4      In Re.

 5      ROBIN LINUS LEHNER and            Case No.

 6      DONYA TINA LEHNER,                22-14616-nmc

 7              Debtors,                  Chapter 7

 8      _____

 9

10              Friday, February 24, 2023

11              BEFORE:  Robert Atkinson

12                 CHAPTER 7 TRUSTEE

13

14

15                 (Section 341 Meeting)

16

17

18

19

20

21

22

23      Job No.: 8734 Nevada Firm #088F

24

25
</pre>

```
 1              A P P E A R A N C E S

 2  ON BEHALF OF DEBTORS ROBIN LINUS LEHNER AND DONYA TINA

 3  LEHNER:

 4        ZACH LARSON, ESQUIRE

 5        Larson & Zirzow

 6        850 East Bonneville Avenue

 7        Las Vegas, Nevada 89101

 8        (702) 382-1170

 9

10  ON BEHALF OF CHAPTER 7 TRUSTEE ROBERT ATKINSON:

11        RYAN ANDERSEN, ESQUIRE

12        MICHAEL N. BEEDE, ESQUIRE

13        Andersen Law Firm

14        3199 East Warm Springs, Suite 400

15        Las Vegas, Nevada 89120

16        (702) 522-1992

17

18  ON BEHALF OF CREDITORS SUPERNOVA 87 LLC, TAURUS LLC,

19  TAURUS II LLC, TAURUS III LLC, TAURUS VII LLC, AND

20  JACKSON LENDING LP:

21        MARK WEISENMILLER, ESQUIRE

22        Garman Turner Gordon

23        7251 Amigo Street, Suite 210

24        Las Vegas, Nevada 89119

25        (725) 777-3000
```

```
 1        A P P E A R A N C E S (cont'd)

 2   ON BEHALF OF CREDITOR PETER ERIKSSON:

 3        ROBERT R. KINAS, ESQUIRE

 4        Of counsel Snell & Wilmer

 5        Hughes Center

 6        3883 Howard Hughes Parkway, Suite 1100

 7        Las Vegas, Nevada 89169

 8        (702) 784-5203

 9

10   ON BEHALF OF CREDITOR RMSCK FUNDING LLC:

11        SCOTT FLEMING, ESQUIRE

12        FLEMING LAW FIRM, PLLC

13        8250 West Charleston Boulevard, Suite 100

14        Las Vegas, Nevada 89117

15        scott@fleminglawlv.com

16        (702) 743-6263

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2                    MR. TRUSTEE:  Calling track one.  This
 3    is Case No. 22-14616.  Today is Friday, February 24th.
 4    It's at 1:03 p.m. and this is the time and place for
 5    the Section 341 meeting of Robin and Donya Lehner.
 6                    The debtors are here physically present
 7    in front of me and they have provided me passport
 8    identifications, and the pictures and the names on the
 9    identification cards match the persons before me.
10    Thank you very much.  I'll give these back to you.
11                    I understand that you do not have
12    Social Security numbers, but instead you do have ITIN
13    numbers.  Is that correct?
14                    MR. LEHNER:  I have Social Security.
15                    MR. TRUSTEE:  You have a Social
16    Security number?  Okay.  Donya, what about you?
17                    MS. LEHNER:  ITIN.
18                    MR. TRUSTEE:  ITIN, terrific.  I'll
19    need satisfactory proof of those two identification
20    numbers.  Please bring them with you to the next
21    meeting and provide them to your counsel.  I
22    appreciate that.  Thank you.
23                    We do have several creditors' counsel
24    here today that are going to be asking questions.
25    I'll just take appearances on the record when they
```

February 24, 2023           

1  come up to ask those questions.

2           If I can get you to please raise your

3  right hands?  I'm going to swear you in.

4  WHEREUPON,

5      ROBIN LINUS LEHNER AND DONYA TINA LEHNER,

6  called as debtors, and having been first duly sworn to

7  tell the truth, the whole truth, and nothing but the

8  truth, was examined and testified as follows:

9           MR. TRUSTEE:  Terrific.  Please state

10  your names for the record.

11           MR. LEHNER:  Robin Lehner.

12           MS. LEHNER:  Donya Lehner.

13           MR. TRUSTEE:  And are you the debtors

14  in this bankruptcy case?

15           MR. LEHNER:  Yes.

16           MS. LEHNER:  Yes.

17           MR. TRUSTEE:  Great.  Counsel for

18  Debtor, want to make an appearance?

19           MR. LARSON:  Zach Larson on behalf of

20  the debtors.

21           MR. TRUSTEE:  And counsel for the

22  State?

23           MR. ANDERSEN:  Yes.  Ryan Andersen and

24  Mike Beede on behalf of Robert Atkinson, Chapter 7

25  Trustee.

Section 341
Meeting

1      MR. TRUSTEE:  Thank you.  To begin

2  with, I will just have a few set of standard

3  questions, but most of my questions will be taken

4  through my counsel.  He's got a whole list of them.

5  So I'll just ask my standard questions to begin with,

6  okay?

7          MS. LEHNER:  Okay.

8          MR. TRUSTEE:  All right.  Most of these

9  are pretty easy, including the first one.  Is the

10  address on your bankruptcy petition, is that your

11  current address?

12          MR. LEHNER:  Yes.

13          MS. LEHNER:  Yes.

14          MR. TRUSTEE:  Okay.  Did you read

15  something called a Bankruptcy Information Sheet before

16  you filed for bankruptcy?

17          MR. LEHNER:  Yes.

18          MS. LEHNER:  Yes.

19          MR. TRUSTEE:  Did you review and sign

20  your bankruptcy schedules and forms before they were

21  filed with the court?

22          MR. LEHNER:  Yes.

23          MS. LEHNER:  Yes.

24          MR. TRUSTEE:  Are you familiar with all

25  of the information in those forms?

```
 1                    MR. LEHNER:  Yes.

 2                    MS. LEHNER:  Yes.

 3                    MR. TRUSTEE:  To the best of your

 4    knowledge, is the information on those forms that got

 5    filed, are they true and correct?

 6                    MR. LEHNER:  To the best of my

 7    knowledge, yes.

 8                    MS. LEHNER:  Yes.

 9                    MR. TRUSTEE:  Are you aware of any

10    changes that need to be made to those forms right now?

11                    MR. LEHNER:  No.

12                    MS. LEHNER:  No.

13                    MR. LARSON:  There's a few amendments

14    we need to make as to valuations.

15                    MR. TRUSTEE:  Okay.  Very well.  So I

16    think those will probably be identified during the

17    subsequent questioning.  So for the purposes of

18    today's meeting, we'll just note that debtor's counsel

19    is anticipating some minor amendments; is that

20    correct?

21                    MR. LARSON:  Yes.

22                    MR. TRUSTEE:  Perfect.  Thank you.  In

23    your bankruptcy schedules to the best of your

24    knowledge, did you list all of your assets and all of

25    your creditors?
```

1           MR. LEHNER:  To the best of my

2   knowledge, yes.

3           MS. LEHNER:  Yes.

4           MR. TRUSTEE:  Have either one of you

5   filed for bankruptcy before?

6           MR. LEHNER:  No.

7           MS. LEHNER:  No.

8           MR. TRUSTEE:  I understand that you've

9   been involved in an insolvency proceeding in Sweden;

10  is that correct?

11          MR. LEHNER:  Yes, after this.

12          MR. TRUSTEE:  I'm sorry?

13          MR. LEHNER:  It happened after I filed

14  for bankruptcy here.

15          MR. TRUSTEE:  Perfect.  Thank you.  Are

16  either one of you under a court order to pay anyone

17  else child support, alimony, or a domestic support

18  obligation?

19          MR. LEHNER:  No.

20          MS. LEHNER:  No.

21          MR. TRUSTEE:  Are the tax returns that

22  you provided to your counsel, are they true and

23  correct copies of what actually got filed with the

24  IRS?

25          MR. LEHNER:  Yes.

```
 1                    MS. LEHNER:  Yes.
 2                    MR. TRUSTEE:  Are you currently
 3    employed?
 4                    MR. LEHNER:  Yes.
 5                    MS. LEHNER:  No.
 6                    MR. TRUSTEE:   And what is your
 7    employer's name?
 8                    MR. LEHNER:  Las Vegas Golden Knights.
 9                    MR. TRUSTEE:  Do you know anyone that
10    lives near or in Niagara Falls, Ontario?
11                    MR. LEHNER:  Yes.
12                    MS. LEHNER:  No.
13                    MR. TRUSTEE:  Who is that person?
14                    MR. LEHNER:  Zenon Konopka.
15                    MR. TRUSTEE:  Zenon Konopka?
16                    MR. LEHNER:  Konopka.
17                    MR. TRUSTEE:  How do you spell that?
18                    MR. LEHNER:  Z-E-N-O-N, K-N-O-P-K-A.
19                    MR. TRUSTEE:   Is that first letter a Z
20    or a Zed?
21                    MR. LEHNER:  Zed.
22                    MS. LEHNER:  Z.
23                    MR. LEHNER:  Z, yeah.
24                    MR. TRUSTEE:  And what's the first
25    name?
```

1    is, is that you believe you have a claim against third

2    party, Paul Croft, on the basis of not fulfilled

3    promises by him?  Is that correct?

4                    MR. LEHNER:  Yes.

5                    MR. LARSON:  Just there's a host of

6    legal causative action that have been discussed with

7    his other legal team.  So not for me to get into that.

8                    MR. WEISENMILLER:  Sure.  I understand.

9    Then I just have a couple questions for Jackson

10   Lending.

11                   MR. TRUSTEE:  Go ahead.

12                   MR. WEISENMILLER:  This is Mark

13   Weisenmiller, Garman Turner Gordan, for Jackson

14   Lending LP.  Just have one question for Mr. Lehner and

15   Ms. Lehner with respect to it.  Can you please turn to

16   page 19 of your schedules and statements?  We're

17   looking at the creditor listed next to 2.2, Jackson

18   Lending LP.  Do you see that?

19                   MR. LEHNER:  Yes.

20                   MR. WEISENMILLER:  All right.  And here

21   you listed that debt as contingent and disputed.  Do

22   you see that, sir?

23                   MR. LEHNER:  Yes.

24                   MR. WEISENMILLER:  Can you tell me the

25   basis of you listing that as contingent and disputed?

1          MR. LEHNER:  I'm not sure.

2          MR. WEISENMILLER:  If I have anymore

3  questions, I'll do a 2004 exam.

4          MR. TRUSTEE:  Thank you.

5          MR. WEISENMILLER:  Thank you for you

6  guys being here and answering my questions.

7          MR. LEHNER:  Sure.

8          MR. TRUSTEE:  Mr. Kinas, would you like

9  to be next?

10         MR. KINAS:  Sure.  Robert Kinas, K-I-N-

11 A-S, of Snell & Wilmer.  I represent Peter Eriksson.

12 Thank you for being here today.  I'm old.  This is

13 what happens when you get old.

14         MR. TRUSTEE:  I'm well aware.  I can't

15 see either.

16         MR. KINAS:  Okay.  Mr. Lehner, you

17 mentioned there's a Swedish insolvency proceeding.

18 Did you have counsel in that proceeding in Sweden?

19         MR. LEHNER:  I think so.

20         MR. KINAS:  Do you know the law firm's

21 name?

22         MR. LEHNER:  I'm not sure.

23         MR. KINAS:  You have access to the

24 information somewhere?

25         MR. LEHNER:  Yeah, yeah, I do.

1              MR. KINAS:  Okay.  Is that insolvency

2    proceeding in Sweden preceding to your knowledge?

3              MR. LEHNER:  Not to my knowledge, no.

4              MR. KINAS:  Do you have any real

5    property assets in Sweden?

6              MR. LEHNER:  No.

7              MR. KINAS:  Do you have any personal

8    property assets in Sweden?

9              MR. LEHNER:  No.

10             MR. KINAS:  As part of the Swedish

11   insolvency, did you provide the insolvency trustee

12   with a list of assets?

13             MR. LEHNER:  I don't have any.

14             MR. KINAS:  As part of the Swedish

15   insolvency proceeding, did you provide the trustee

16   with a list of liabilities?

17             MR. LEHNER:  I'm not sure.

18             MR. LARSON:  My understanding is your

19   office did.  To try to help you out as involuntary,

20   that wasn't actually authorized when Mr. Lehner filed.

21   So there's no follow-through in that proceeding

22   whatsoever.  But I'm happy to get you all the

23   information.

24             MR. KINAS:  Perfect.  Thanks.  So I've

25   read through your statements and schedules and I have

1  a couple of big picture questions, right?  So I've

2  seen that in 2020 it looks like you had evidence to at

3  least seven loans for $6 million.  In 2021 it looks

4  like you entered into three loan transactions for

5  around 2.7 million, and in 2022 it looks like you

6  entered into 13 loans for around $18 million.  I don't

7  want to go into the details.  I just have some general

8  questions.

9           So at the time you entered into those

10  loans in 2020, 2021, and 2022, you were a fulltime

11  hockey player for the Chicago Blackhawks and the Vegas

12  Golden Knights; is that correct?

13           MR. LEHNER:  Yes.

14           MR. KINAS:  And during those years when

15  you took out, then you were involved in these loans,

16  were you the person seeking out all of these loans?

17           MR. LEHNER:  Yes.

18           MR. KINAS:  So you approached all these

19  lenders --

20           MR. LEHNER:  No.

21           MR. KINAS:  So who, who approached all

22  these lenders for a loan?

23           MR. LEHNER:  It was various, various

24  people that worked together with my dad.

25           MR. KINAS:  So your dad's name is what?

1                    MR. LEHNER:  Michael Lehner.

2                    MR. KINAS:  And so Michael Lehner and

3    others approached the lenders for loans; is that

4    correct?

5                    MR. LEHNER:  Yes.

6                    MR. KINAS:  But it was not you?

7                    MR. LEHNER:  The majority, no.

8                    MR. KINAS:  So why was Michael Lehner

9    looking for these loans?

10                   MR. LEHNER:  Different business

11   ventures.

12                   MR. KINAS:  And were you involved in

13   the business ventures?

14                   MR. LEHNER:  Not really.

15                   MR. KINAS:  Why did you agree to

16   guarantee these loans if you were not involved in the

17   business ventures?

18                   MR. LEHNER:  Try to help a family

19   member.

20                   MR. KINAS:  So as part of these loans,

21   were you involved in discussions with the lender on

22   each loan?

23                   MR. LEHNER:  No.

24                   MR. KINAS:  So as part of the loan

25   process, are you familiar with the underwriting?  Such

1  as when you went through the loan process, usually you

2  have to file an application for a loan.  Are you

3  familiar with that process?

4                    MR. LEHNER:  Somewhat.

5                    MR. KINAS:  And were you involved in

6  filling out the loan applications for all these loans?

7                    MR. LEHNER:  Yeah, sort of.  Yeah, for

8  some of them.

9                    MR. KINAS:  And as a guarantor, did

10  some of the lenders request financial statements from

11  you?

12                    MR. LEHNER:  Some of them, yeah.

13                    MR. KINAS:  Was it your father who was

14  primarily responsible for interacting with the lender?

15                    MR. LEHNER:  No.

16                    MR. KINAS:  Who was primarily

17  responsible for interacting with the lenders on the

18  loans?

19                    MR. LEHNER:  It was different people

20  working with my father.  Were working together with

21  the business to find funds.

22                    MR. KINAS:  You were not the primary

23  person, though, working with the lenders?

24                    MR. LEHNER:  On most of them, no.

25                    MR. KINAS:  So at some point during the

 1 | loan process, did the lender ask you to be a

 2 | guarantor?

 3 |                    MR. LEHNER:  Yes.

 4 |                    MR. KINAS:  And again, when they -- I

 5 | see here the financial statements that you provided.

 6 | How personally did you keep track of all of the loans

 7 | that you had guaranteed?  Do you have like QuickBooks

 8 | or do you have a software program?

 9 |                    MR. LEHNER:  No.  It was mostly the

10 | people that worked with him.

11 |                    MR. KINAS:  So when providing the

12 | lenders with the financial statements, who would you

13 | give your financial information to give to the lender?

14 |                    MR. LEHNER:  It was different people at

15 | different times.  Latest one was a guy called John

16 | Hochbaum.

17 |                    MR. KINAS:  Is he a financial advisor?

18 |                    MR. LEHNER:  I don't know exactly what,

19 | what his title was.

20 |                    MR. KINAS:  So you provided -- as to --

21 | because you've had so many loans, were you constantly

22 | providing updated financial information to this third

23 | party to give to the lenders?

24 |                    MR. LEHNER:  That's what they said,

25 | yes.

1           MR. KINAS:  What do you say?

2           MR. LEHNER:  Yeah, I trust that they

3  provided updated records, yes.

4           MR. KINAS:  So how did you, how did you

5  provide to your debtor's counsel a list of all the

6  lenders who you guaranteed loans to?

7           MR. LEHNER:  I'm not sure.

8           MR. KINAS:  Again, do you have -- and

9  personally do you have a software program that

10 lists --

11          MR. LEHNER:  No.

12          MR. KINAS:  You do not?  You do not

13 keep records of who you guaranteed loans?

14          MR. LEHNER:  No, I worked with, I

15 worked with many different lawyers and many different

16 people that was working for the company that updated

17 it.

18          MR. KINAS:  And as to the financial

19 statements that you provided to certain lenders, did

20 you review them for accuracy before you provided them

21 to the lenders?

22          MR. LEHNER:  Yeah, I think so.

23          MR. KINAS:  After the loans closed with

24 each lender, did you get a copy of the loan documents?

25          MR. LEHNER:  I personally, I didn't,

1   no.

2             MR. KINAS:  When the loans closed, were

3   you, did you participate in the loan closings?

4             MR. LEHNER:  I mean I was part of some

5   signings.

6             MR. KINAS:  So my client is Peter

7   Eriksson.  Do you recall signing a settlement

8   agreement with him?  This is the loan you took -- so

9   on the Swedish one, have you seen that before?

10            MR. LEHNER:  Yes.

11            MR. KINAS:  And on page two, is that

12  your signature?

13            MR. LEHNER:  Yes.

14            MR. KINAS:  And when you reached this

15  settlement agreement, had you had in-person meetings

16  with Mr. Eriksson?

17            MR. LEHNER:  I don't believe I did.

18            MR. KINAS:  Were the negotiations that

19  took place by phone or Zoom?

20            MR. LEHNER:  I believe I talked to his

21  lawyer.  That was a long time ago.

22            MR. KINAS:  So in the settlement

23  agreement, it states that you agreed to pay Mr.

24  Eriksson $49,261 a month for 12 months from October

25  2021 to September '22; do you see that?

1                        MR. LEHNER:  Yep.

2                        MR. KINAS:  Did you make any of the

3   payments?

4                        MR. LEHNER:  I don't believe so, no.

5                        MR. KINAS:  Do you recall sharing with

6   Mr. Eriksson or his counsel that you'd be able to make

7   the payments because of your current NHL salary?

8                        MR. LEHNER:  I said that was my

9   intention, yes.

10                       MR. KINAS:  Did you disclose to Mr.

11  Eriksson at the time that you had guaranteed lots of

12  other loans?

13                       MR. LEHNER:  I don't believe so, no.

14                       MR. KINAS:  So in schedule, on your

15  statements and schedules -- how are you going on this?

16  Do you go by --

17                       MR. TRUSTEE:  Page 68.

18                       MR. KINAS:  Page 68, Question 8, right

19  there.  Just take a look at that.  So you take a loan

20  and look at Question 8?  I believe Question 8 says,

21  it's about monies that you paid during the last year.

22  Do you see that?  Just take a second and let me know

23  when you've finished reading it.

24                       MR. LEHNER:  Yeah.

25                       MR. KINAS:  So you see that there are

1  three, the answer to Question 8 states that on April

2  26th of 2022, you transferred 900,000 US dollars to a

3  person named Milos and then -- do you see that?

4                    MR. LEHNER:  Yes.

5                    MR. KINAS:  And did you actually

6  transfer $900,000 to Milos?

7                    MR. LEHNER:  I'm pretty sure I did,

8  yes.

9                    MR. KINAS:  And on May 18th of '22,

10  another $900,000 to Milos; do you see that?

11                   MR. LEHNER:  Yes.

12                   MR. KINAS:  And did you actually

13  transfer that money?

14                   MR. LEHNER:  Yes.

15                   MR. KINAS:  And on May 19th of '22, a

16  million five to someone named, is it Mazan?  Do you

17  see that?

18                   MR. LEHNER:  Yes.

19                   MR. KINAS:  And did you transfer the

20  million five to Masan?

21                   MR. LEHNER:  Yes.

22                   MR. KINAS:  And so what were these

23  payments to all three for?

24                   MR. LEHNER:  Technology.

25                   MR. KINAS:  Were you purchasing assets?

 1              MR. LEHNER:  No.  I was, I already had

 2   a contract in place for different types of renewable

 3   technology that was going to be purchased.  And I was

 4   behind and it was, and I, and I paid them according to

 5   contract.

 6              MR. KINAS:  Okay.  And so did this

 7   money come from a loan or did it come from your NHL

 8   salary?

 9              MR. LEHNER:  Well, a bit of both, I

10   believe.

11              MR. KINAS:  And so this is during the

12   time period where you were going to be paying Mr.

13   Eriksson monthly payments.  So did you have the

14   ability to pay Mr. Eriksson's payments and just chose

15   not to?

16              MR. LEHNER:  No.

17              MR. KINAS:  Why did you not pay Mr.

18   Eriksson monthly payments?

19              MR. LEHNER:  As you see, it's, I, I

20   fulfilled a contract and I, it was a long process with

21   Mr. Eriksson and unfortunately the Swedish justice

22   system, I couldn't, he was already paid and there's

23   papers and evidence to all that.  Mr. Eriksson was

24   paid in full and there was some things and I was

25   called to trial in Sweden without knowing and I lost

1   that court case by default because I didn't appear,

2   appear.

3                    And it, it was a lot of, you know, it

4   was media and all that stuff involved.  He was already

5   paid in full and they were playing that against media.

6   And I, I'm, with my lawyers, going to seek, seek in

7   the US to redo that whole thing.

8                    MR. KINAS:  Okay.  And how do you think

9   -- from what source do you think Mr. Eriksson was paid

10  in full?

11                   MR. LEHNER:  By the business deal that

12  was done with my dad at the time in Sweden.  They

13  purchased, they purchased houses and they paid them

14  back in, in rent, what the deal was, said.  But it was

15  taken to court without my knowledge and I wasn't, I

16  didn't appear.  So I lost the case.

17                   MR. KINAS:  Okay.  That's all I've got.

18  Thank you for your time today.

19                   MR. LEHNER:  Yep.

20                   MR. LARSON:  Can you give me a copy of

21  that?  Can I take that?

22                   MR. KINAS:  Yeah, you can take it.

23                   MR. LARSON:  Thank you.

24                   MR. TRUSTEE:  Before we have the next

25  counsel speak, I have a quick call-out questions.  On

1   those three creditor payments that we just went

2   through, the 900,000, the 900,000 and the 1.5 million,

3   you made the statement I had a technology contract or

4   something similar to that.  Do you remember that?

5                    MR. LEHNER:  Yes.

6                    MR. TRUSTEE:  Was it you that had the

7   contract?  You personally, or was it a business

8   contract?

9                    MR. LEHNER:  It was a business

10  contract.

11                   MR. TRUSTEE:  Okay.  And who was the

12  party that was the business?

13                   MR. LEHNER:  That I paid?

14                   MR. LARSON:  It was one of the

15  SolarCode entities.

16                   MR. TRUSTEE:  One of the SolarCode

17  entities; is that fair enough?

18                   MR. LEHNER:  Yes.

19                   MR. TRUSTEE:  Okay.  And so that was a

20  contract between one of the SolarCode entities and

21  these transferees?

22                   MR. LEHNER:  Yes.

23                   MR. TRUSTEE:  Were you part of that

24  contract personally?

25                   MR. LEHNER:  Pretty sure I was.

1   Have been a lot of, spent a lot of money going to

2   engineer firms, Black & Veatch, and there's some other

3   engineer company.  I worked with Black & Veatch.  It

4   costs a lot of money to get the proof of concepts and

5   all that stuff.

6                   MR. ANDERSEN:  Okay.  Do you know how

7   much money Michael Lehner has taken out of SolarCode?

8                   MR. LEHNER:  No.

9                   MR. ANDERSEN:  Okay.  We're on page 25,

10  on the bottom, that's, you see Bryan Cave?  Were they

11  your counsel?

12                  MR. LEHNER:  I don't the recognize the

13  name.

14                  MR. ANDERSEN:  Bryan Cave, it says here

15  that it's business debt for legal services related to

16  RL Exotics.  Does that ring a bell?

17                  MR. LEHNER:  No, it doesn't.

18                  MR. ANDERSEN:  Okay.

19                  MR. LEHNER:  One second.

20                  MR. ANDERSEN:  Would this have

21  potentially been for the lawsuit that took place in

22  Missouri?

23                  MR. LEHNER:  Yes, yes, it was.  Now I

24  recognize it.

25                  MR. ANDERSEN:  Okay.